Cassie JACKSON, on behalf of herself and all others similarly situated, Plaintiff,

v.

FEDERAL NATIONAL MORTGAGE ASSOCIATION d/b/a Fannie Mae, and Open Systems Technologies, Inc., Defendants.

CIVIL ACTION NO. 1:15-CV-01411-AT

United States District Court, N.D. Georgia, Atlanta Division.

Signed March 29, 2016

Amanda A. Farahany, Victor Severin Roberts, Benjamin Andrew Stark, Barrett & Farahany, LLP, C. Andrew Head, Jerilyn Elaine Gardner, Head Law Firm, LLC, Atlanta, GA, for Plaintiff.

Teresa Lynn Reuter, Sarah M. Konsky, Sidley Austin LLP-IL, Chicago, IL, Wendy Lazerson, Sidley Austin LLP, Palo Alto, CA, Scott Gilbert Blews, Taylor English Duma LLP, Atlanta, GA, for Federal National Mortgage Association.

Brian D. Shekell, David M. Cessante, Clark Hill, PLC, Detroit, MI, R. Patrick White, Casey Gilson P.C., Atlanta, GA, Stephanie K. Rawitt, Clark Hill PLC, Philadelphia, PA, for Defendant Open Systems Technologies.

## ORDER

Amy Totenberg, United States District Judge

This matter is before the Court on Plaintiff's First Motion to Certify Class for Conditional Collective Action Certification and Issuance of Notice to Class [Doc. 31], Open Systems Technologies, Inc.'s Motion to Dismiss Opt-in Plaintiffs and Motion to Strike Collective Action Allegations [Doc. 38], and Plaintiff's Motion to Toll the Statute of Limitations for Opt-in Plaintiffs to Bring Individual Suits [Doc. 54]. For the reasons provided in this Order, Plaintiff's Motion to Certify is **GRANTED** as provided herein; Open Systems' Motion to Dismiss and Motion to Strike is **DENIED**; and Plaintiff's Motion to Toll the Statute of Limitations is **DENIED WITHOUT PREJUDICE**.

### I. Factual Background

Plaintiff Cassie Jackson filed this putative class action, alleging that Defendants failed to pay her and other credit underwriters overtime wages in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219. (Am. Compl. ¶¶ 2, 19.) Defendant Fannie Mae "is a government-sponsored entity that operates in the secondary mortgage market." (Fannie Mae's Resp. at 4 (citing 12 U.S.C. §§ 1716, 1719).) Following the mortgage crisis, Fannie Mae sought to have a sample of defaulted loans it owned reviewed by "experienced credit underwriters" so that it could determine whether or not to sell those loans back to the entities it bought them from. (Kirk Decl. ¶¶ 3-4.) Fannie Mae contracted with eight different staffing vendors, including Defendant Open Systems, to supplement its existing credit underwriting capabilities and complete these reviews at its Atlanta, Georgia office. (Id. ¶¶ 8-9; St. Clair Decl. ¶ 4, Doc. 39-3.) Fannie Mae treated all underwriters provided by the vendors as contractors of Fannie Mae and employees of the respective vendors. (St. Clair Decl. ¶ 4.) Fannie Mae treated underwriters not provided by staffing companies as W-2 employees. (Kirk Decl. ¶ 28; Am. Compl. ¶ 13.) Fannie Mae typically employed "60-80" credit underwriters at its Atlanta office. (Jackson Decl. ¶ 3.)

Defendant Open Systems hired Plaintiff as an underwriter on July 23, 2012 and placed her with Fannie Mae. (Bernetich Decl. ¶ 4, Doc. 36-2; Jackson Decl. ¶ 2.)

During this time, Open Systems treated Plaintiff and its other Fannie Mae underwriters as non-exempt W-2 employees.[1] (Bernetich Decl. ¶¶ 4-5; Am. Compl. ¶¶ 28.)

Jackson defines the collective class she seeks to represent and for whom she seeks to send "opt-in" notices for purposes of the collective action as follows: "[A]ll hourly paid credit underwriters that worked in Defendant Fannie Mae's Atlanta, Georgia office while being treated as independent contractors by Fannie Mae at any time during the last three years." (Pl.'s Br. at 2.) Plaintiff supports her Motion and the allegations stated in the Amended Complaint with her own declaration and the declarations of four other former Fannie Mae credit underwriters. Jackson and these opt-in plaintiffs claim to be similarly situated with respect to their job requirements and pay provisions because each was treated as an independent contractor by Fannie Mae, and claims that Fannie Mae prohibited the reporting of overtime, despite subjecting contractors to production quotas that required more than forty hours per week to satisfy. (Jackson Decl. ¶ 9; Hawkins Decl. ¶ 9; Stewart Decl. ¶ 9; Tolbert Decl. ¶ 9; Hill Decl. ¶ 9, Doc. 31-6.) To date, the four additional declarants and six other additional plaintiffs have filed "Consent to Join Collective Action" forms with the Court. (See Docs. 7, 11-13, 30, 48, and 59.)

Plaintiff makes two primary allegations in support of her claim for violations of the FLSA. First, Plaintiff argues that Defendant Fannie Mae maintained a policy of misclassifying Plaintiff and other credit underwriters placed at Fannie Mae by staffing agencies as "independent contractors" despite the fact that they performed the same duties as W-2 underwriters. (Am. Compl. ¶¶ 50-51.) Plaintiff claims that during the past three years, all credit underwriters, regardless of whether they were treated as W-2 employees or independent contractors, worked in close proximity to one another, attended work meetings together, and reported to the same supervisors.[2] (Jackson Decl. ¶¶ 5, 19.) They also performed the same job duties: credit underwriters performed secondary review of loans that Fannie Mae had purchased to ensure that all applicable documentation had been provided by the seller. (Id. ¶ 5.) All credit underwriters pulled loans to review from the same pool and all were subject to daily supervision by Fannie Mae "credit underwriting managers." (Id. ¶¶ 19, 21.) Plaintiff also alleges, both W-2 and independent contractor credit underwriters working on site at the Atlanta office had to review the same number of loan files each day.[3] (Id. ¶ 21.) Finally, Plaintiff claims that many underwriters classified by Fannie Mae as independent contractors worked for Fannie Mae for more than two years. (Id. ¶ 23.)

Second, Plaintiff claims that both Fannie Mae and Open Systems knew or had rea-

---

1. To date, none of the additional plaintiffs that filed "Consent to Join Collective Action" forms claimed to be employees of Open Systems. (St. Clair Decl. ¶ 9.) Several however, averred to be being placed at Fannie Mae by other, third party staffing agencies. (See e.g., Stewart Decl. ¶ 2, Doc. 31-4; Tolbert Decl. ¶ 2, Doc. 31-5.) In her Complaint, Plaintiff reserved the right to seek leave from the Court to amend her Complaint by adding additional, third party staffing agencies as Defendants in this action if warranted by the facts. (Am. Compl. ¶ 2, note 1.)

2. The reporting structure at Fannie Mae's Atlanta office divided credit underwriters into six teams of approximately ten to fourteen underwriters, each supervised by a "credit underwriting manager" who reported to Fannie Mae's Director of Underwriting Standards. Jackson Decl. ¶ 4.

3. Plaintiff clarifies that credit underwriters working from home had higher production requirements than underwriters working in the office. Jackson Decl. ¶ 8.

son to know that Fannie Mae credit underwriters regularly worked in excess of forty hours in a week without receiving overtime compensation. (Am. Compl. ¶ 61.) Specifically, Plaintiff alleges that Fannie Mae subjected credit underwriters to production quotas that inherently required overtime hours, yet it prohibited credit underwriters from reporting any overtime hours until they met those quotas. (Jackson Decl. ¶ 8.) For example, if Fannie Mae assigned an underwriter a quota of three loan files per day, that underwriter could not report any overtime hours for that week unless the quota had been met, irrespective of whether meeting that quota necessarily required overtime work. (*Id.* ¶ 9.)

Plaintiff asserts that Fannie Mae's practice of requiring off the clock overtime was "common knowledge at the office and simply accepted as part of the job." (*See e.g.*, Jackson Decl. ¶ 11; Tolbert Decl. ¶ 11, Doc. 31-5; *see also* Jackson Decl. ¶ 10 ("[I]t was a near universal practice of credit underwriters to work overtime hours off the clock to meet our production requirements.").) According to Jackson, Fannie Mae management employees, including credit underwriting managers, communicated this policy to credit underwriters during departmental meetings and through emails restating the directive not to report overtime. (Jackson Decl. ¶ 15; Stewart Decl. ¶ 13, Doc. 31-4.) Another underwriter claimed that her supervisor sent emails encouraging his team to work on the weekends despite the fact they had already worked in excess of forty hours to complete their base production requirements. (Hawkins Decl. ¶ 13, Doc. 31-3.)

Plaintiff also alleges that, in or about July 2014, Fannie Mae asked its W-2 credit underwriters to provide it with estimates of their overtime hours worked. (Jackson Decl. ¶ 13; Kirk Decl. ¶ 30.) After an arbitrator found that Fannie Mae letter review underwriters no longer qualified for an administrative exemption, Fannie Mae reclassified its W-2 credit underwriters from exempt to non-exempt status, and retroactively paid overtime wages to any W-2 underwriters that reported working more than forty hours in a week.[4] (Am. Compl. ¶ 22; Kirk Decl. ¶¶ 28, 30.) Fannie Mae did not pay, or arrange to pay, any back wages to credit underwriters classified as independent contractors like Jackson. (Jackson Decl. ¶ 13.)

Defendants Fannie Mae and Open Systems each filed a Response to the Motion. Fannie Mae offers the declarations of several employees that work with or within the credit underwriting department. Multiple credit underwriting managers asserted that they never instructed contractors not to report hours worked and further stated that doing so would violate Fannie Mae policy. (Harger Decl. ¶ 12, Doc. 39-4; Olas Decl. ¶ 4, Doc. 39-5; Stoddard Decl. ¶¶ 12, 19, Doc. 39-6; White Decl. ¶ 6, Doc. 39-7.) According to Koren St. Clair, a Procurement Manager in Fannie Mae's Contractor Resource Center, Fannie Mae required all contractor credit underwriters to report "every minute" worked. (St. Clair Decl. ¶¶ 1, 15.)

Fannie Mae contractors reported time in an online tool called Fieldglass. (*Id.* ¶ 6.) St. Clair explains that Fieldglass reports were subject to review and verification by Fannie Mae underwriting managers to ensure that the hours reported matched the hours a contractor was scheduled to be providing services. (*Id.*) St. Clair also contends that Fannie Mae played no role in time reporting or wage processing for independent contractors beyond verifying

---

4. Fannie Mae characterizes the reclassification of its W-2 underwriters, its request for estimates of overtime hours worked, and its retroactive payment of overtime wages as "business decision[s]." Kirk Decl. ¶¶ 28, 30.

contractors' Fieldglass reports. (*Id.* ¶ 7.) Specifically, St. Clair asserts that the Professional Services Agreements ("PSA") entered into by Fannie Mae and the staffing vendors expressly provided that the vendors, and not Fannie Mae, had sole responsibility for paying contract underwriters' wages and for complying with FLSA provisions.[5] (*Id.* ¶¶ 11-12.)

Defendant Open Systems responds by offering the declaration of Joseph Bernetich, Open Systems' VP of Operations. (Bernetich Decl. ¶ 1.) Bernetich states that, with the exception of Jackson, none of the individuals who have filed opt-in notices to date were ever employed by Open Systems, and so it has no knowledge of the terms and conditions of their employment.

## II. Analysis

### A. The Collective Action Certification Process in the Eleventh Circuit

■ Section 216(b) of the FLSA authorizes employees to bring a collective action against employers accused of violating the FLSA as follows:

> An action … may be maintained against any employer … by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed with the court in which such action is brought.

29 U.S.C. § 216(b).[6] This Court has the discretion to authorize the sending of no-

tice to potential class members in a collective action. *Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 169–170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir.2001). A collective action is particularly appropriate when it permits the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged … activity." *Hoffmann–La Roche*, 493 U.S. at 170, 110 S.Ct. 482. "The benefits of a collective action 'depend on employees receiving accurate and timely notice … so that they can make informed decisions about whether to participate.'" *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259–60 (11th Cir.2008).

■ The Eleventh Circuit applies a two-stage process to FLSA collective action. *See Hipp*, 252 F.3d at 1218; *Morgan*, 551 F.3d at 1260-61. The first stage in determining whether a collective action should be certified is the notice stage (also referred to as the conditional certification stage) at which time the court determines whether other similarly situated employees should be notified. *Morgan*, 551 F.3d at 1261. The second stage of the certification process is "typically precipitated by a motion for 'decertification' by the defendant usually filed after discovery is largely complete and the matter is ready for trial." *Hipp*, 252 F.3d at 1218; *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir.2007). At the conclusion of discovery when a matter is ready for trial, the district court uses the factual information gathered during discovery to deter-

---

**5.** Fannie Mae's PSA also provided that staffing agencies could charge Fannie Mae no more than forty hours per week for each contractor without receiving authorization. (St. Clair Decl. ¶¶ 13-14.)

**6.** Participants in a putative collective action must affirmatively opt into the suit. 29 U.S.C.

§ 216(b). Thus, the decision to certify a collective action, on its own, does not create a class of plaintiffs; rather the "existence of a collective action under § 216(b) … depend[s] on the active participation of other plaintiffs." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259–60 (11th Cir.2008).

mine whether the plaintiffs are actually similarly situated, and if they are not the court decertifies the class.[7] *Anderson*, 488 F.3d at 953.

■ In the first stage of the certification process, the district court makes a decision based on limited information, such as the pleadings in the complaint and related affidavits, whether notice of the action should be given to potential class members.[8] *Hipp*, 252 F.3d at 1218; *Anderson*, 488 F.3d at 952–53. A plaintiff has the burden of showing a "reasonable basis" for his claim that there are other similarly situated employees. *Morgan*, 551 F.3d at 1260; *Grayson v. K–Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996). The burden on the plaintiff, however, is not a heavy one. At the first stage of class certification, because the court has minimal evidence the "determination is made using a fairly lenient standard, and typically results in 'conditional certification' of a representative class."[9] *Hipp*, 252 F.3d at 1218; *Morgan*, 551 F.3d at 1260 (describing the standard for determining similarity, at this initial stage, as "not particularly strin-

7. During the second stage, the standard "is less lenient, and the plaintiff bears a heavier burden." *Morgan*, 551 F.3d at 1261. The district court "has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." *Id.*

8. At the second stage, in order to overcome the defendant's evidence opposing certification, plaintiffs must rely on more than just allegations and affidavits. *Morgan*, 551 F.3d at 1261.

9. Courts in this district routinely grant conditional certification under the FLSA applying this fairly lenient standard. *See Reece v. United Home Care of N. Atlanta, Inc.*, 1:12–CV–2070–RWS, 2013 WL 895088, at *3–4 (N.D.Ga. March 8, 2013) (Story, J.) (stating that plaintiff had submitted sufficient evidence of similarity to "satisfy the lenient standard for conditional certification," explaining that at the notice stage, "the Court considers whether Plaintiff is similarly situated to the putative class in terms of job position and pay policies" and that at this stage, "the Court need not engage in credibility determinations"); *Bradford v. CVS Pharmacy, Inc.*, No. 1:12–CV–1159–TWT, 2013 WL 425060, at *5 (N.D.Ga. Feb. 4, 2013) (Thrash, J.) (explaining that "Plaintiff meets his fairly lenient burden" in part because "it is not appropriate for the Court to conduct individualized inquiries at the conditional certification stage, or consider the possibility of having to make individualized inquiries in the future when ruling at this stage"); *Lawson v. Bell S. Telecomm., Inc.*, No. 1:09–CV–3528–JEC, 2011 WL 3608462, at *7 (N.D.Ga. Aug. 16, 2011) (Carnes, J.) (granting the plaintiffs' motion for conditional certification and issuance of notice, stating that a "plaintiff's burden is 'not heavy' and rejecting the defendant's arguments regarding geographic diversity and varying duties stating, "[d]ifferences in individual factual and employment settings are generally a consideration for the second stage"); *McCray v. Cellco Partnership*, No. 1:10–CV–2821–SCJ, 2011 WL 2893061 (N.D.Ga. April 8, 2011) (Jones, J.) (rejecting defendant's reliance on non-binding district court decisions and arguments in opposition to certification in recognition that the court's analysis is more stringent, and the plaintiff's burden is heavier at the second decertification stage); *Riddle v. Suntrust Bank*, 2009 WL 3148768, at *3 (N.D.Ga.2009) (Story, J.) (rejecting defendant's argument that putative class members were not similarly situated because some of them have "different higher level responsibilities beyond the core technical services [all putative class members] provide"); *Scott v. Heartland Home Fin., Inc.*, No. 1:05–cv–2812–TWT, 2006 WL 1209813, at *2 (N.D.Ga. May 3, 2006) (Thrash, J) (declining to resolve factual issues or make credibility determinations at the notice stage); *Kreher v. City of Atlanta, Ga.*, No. 1:04–cv–2651–WSD, 2006 WL 739572, at *4 (N.D.Ga. Mar. 20, 2006) (Duffey, J.) ("[A] court adjudicating a motion to authorize a collective action need not evaluate the merits of plaintiffs' claims in order to determine whether a similarly situated group exists."); *Cash v. Gwinnett Sprinkler Co.*, No. 1:08–cv–2858–JOF, 2008 WL 5225874 (N.D.Ga. Dec. 12, 2008)) (Forrester, J.) (noting the allegation of a common practice by the defendant as the basis for granting certification).

gent," "fairly lenient," "flexib[le]," "not heavy," and "less stringent than that for joinder under Rule 20(a) or for separate trials under 42(b).")

■ Before granting conditional certification, the court should determine: (1) whether employees sought to be included in the putative class are similarly situated with respect to their job requirements and pay provisions; and (2) whether there are other employees who wish to opt-in to the action. *Dybach v. State of Fla. Dept. of Corrections*, 942 F.2d 1562, 1567–68 (11th Cir.1991). Here, Jackson offers her own declaration and the declarations of four other Fannie Mae credit underwriters who wish to opt-in to the putative class action. Each avers that she was subject to the same allegedly unlawful Fannie Mae policy prohibiting contractors from reporting the overtime hours, despite the fact that off-the-clock hours were required to meet Fannie Mae's production goals. In addition, these four declarants and six other Fannie Mae credit underwriters have submitted consent to join forms. Thus the Court examines only whether the named Plaintiff is similarly situated to these potential class-members. *See Riddle v. Suntrust Bank*, No. 1:08–CV–1411–RWS, 2009 WL 3148768, at *3 (N.D.Ga.2009) (finding that because actual notice has not been sent to putative class members, the existence of only three opt-in plaintiffs sufficiently demonstrated an interest by other employees to opt-in to the suit); *Reece v. United Home Care of N. Atlanta, Inc.*, 1:12–CV–2070–RWS, 2013 WL 895088, at *4 (N.D.Ga. March 8, 2013) (certifying a class at the notice stage when only two opt-in plaintiffs had joined the suit).

■■ The focus of the court's inquiry at this stage is not on whether there has been an actual violation of law, but on whether the proposed plaintiffs are similarly situated with respect to their allegations that the law has been violated. *Kre-*

*her v. City of Atlanta, Ga.*, No. 1:04–cv–2651–WSD, 2006 WL 739572, at *4 (N.D.Ga. Mar. 20, 2006) (stating that plaintiffs are not required to submit evidence of a highly particularized nature and finding that "[a]lthough lacking in some detail, Plaintiffs' declarations establish the existence of other employees employed in similar positions and subjected to similar policies.") Applying the fairly lenient standard of the notice/conditional certification stage, plaintiffs are not required to show that they hold identical positions. *Hipp*, 252 F.3d at 1217; *Grayson*, 79 F.3d at 1096. Rather for purposes of conditional certification, plaintiffs may show either (1) that their job positions and duties are similar to those positions held by the putative class members, *see Hipp*, 252 F.3d at 1217; *Grayson*, 79 F.3d at 1096, or (2) that plaintiffs and the putative class members were all subject to the same unified policy, plan, or scheme that forms the basis of the alleged FLSA violation, *see, e.g., Morgan*, 551 F.3d at 1262–64 (upholding district court's denial of employer's motion to decertify and finding that "there is nothing unfair about litigating a single corporate decision in a single collective action"); *Scott v. Heartland Home Fin., Inc.*, No. 1:05–cv–2812–TWT, 2006 WL 1209813, at *2 (N.D.Ga. May 3, 2006) (holding that the notice stage requires only "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan"); *Lindberg v. UHS of Lakeside, LLC*, 761 F.Supp.2d 752 (W.D.Tenn.2011) ("It is clear that plaintiffs are similarly situated when they suffer from a single, FLSA violating policy, and when proof of that policy or of conduct in conformity with that policy proves a violation as to all the plaintiffs ... Plaintiffs may also meet the similarly situated requirement if they demonstrate, at a minimum, that 'their claims [are] unified by common theories of defendants' statutory

violations, even if the proofs of these theories are inevitably individualized and distinct.").

## B. Defendant Fannie Mae's Objections to Conditional Certification

Fannie Mae's objections to certification are flawed in two primary ways. First, Fannie Mae overstates the legal barriers to conditional collective action certification articulated by decisions in this district. Second, most of Fannie Mae's arguments—such as its assertion that Open Systems and Fannie Mae are not joint employers—are based on factual issues or mixed fact and law determinations better addressed at the decertification stage.

### 1. Joint Employer Doctrine

The Court first addresses Fannie Mae's argument that Plaintiff has failed to meet her burden in establishing that Fannie Mae is a joint employer with Open Systems and the unnamed staffing agencies.

■ Typically the joint employer doctrine is addressed at the decertification or summary judgment stage. *See, e.g., Reece v. United Home Care of N. Atlanta, Inc.,* No. 1:12–CV–2070–RWS, 2013 WL 895088, at *5 (N.D.Ga. Mar. 8, 2013) (citing *Johnson v. VCG Holding Corp.,* 802 F.Supp.2d 227, 239 (D.Me. July 25, 2011) for the proposition that issues relating to liability as a joint employer "are properly reserved for dispositive motions or for the second stage of the class certification process"); *Manning v. Goldbelt Falcon, LLC,* Civ. A.

No. 08–3427(JEI), 2010 WL 3906735 (D.N.J. Sept. 29, 2010) (citing cases); *McKnight v. D. Houston, Inc.,* 756 F.Supp.2d 794, 806 (S.D.Tex.2010) ("In instances where a motion for conditional certification involves a potential class of employees that worked for separate, but related, employers, courts have reserved consideration of whether the separate employers are joint employers for a final, stage two determination."); *Kaluom v. Stolt Offshore, Inc.,* 474 F.Supp.2d 866, 875 (S.D.Tex.2007) ("If Defendant can show that the Economics Reality Test produces significantly different results for different employers after discovery has been conducted regarding the other employers, then Defendant should move for decertification at that time.")[10]

The Court addresses this issue first because Plaintiffs have only joined one of the eight staffing agencies which purportedly were joint employers with Fannie Mae, and because Fannie Mae's status as a joint employer may be integral to the outcome of this case.[11]

■ A determination of employer status under the FLSA for liability purposes is ultimately a legal determination, but requires the district court to make subsidiary factual findings. *Russell v. Promove, LLC,* 1:06–CV–00659–RWS, 2007 WL 2274770, *3 (N.D.Ga. Aug. 7, 2007) (Story, J.). In determining whether an employer-employee relationship exists under the

10. Fannie Mae's own cases on this issue were all decided at summary judgment, *Aimable v. Long & Scott Farms,* 20 F.3d 434, 437 (11th Cir.1994) (summary judgment); *Layton v. DHL Exp. (USA) Inc.,* 686 F.3d 1172, 1175–1178 (11th Cir.2012), or under a certification standard stricter than that employed by the other courts in this district. *Beecher v. Steak N Shake Operations, Inc.,* 904 F.Supp.2d 1289, 1298 (N.D.Ga.2012) (Evans, J.)

11. The Court does not view its discussion as in any way indicating that a thorough examination of the joint employer issue is necessary in every FLSA collective action certification case. In fact, there is a good argument that it is not even necessary in *this* case. However, given the fact that Plaintiff has only joined one staffing agency at this point (though she has indicated she will join others), and given the importance of the issue to this Order, the Court provides some background as to how it reached its decision.

FLSA, the court must examine the facts "in light of the 'economic reality' of the relationship between the parties." *Villarreal v. Woodham*, 113 F.3d 202, 205 (11th Cir.1997) (citing *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961)).[12] The Eleventh Circuit has identified several factors for review under the economic-reality test in determining whether an individual or entity is an employer under the FLSA: they include: (1) the nature and degree of control of the workers; (2) the degree of supervision, direct or indirect, of the work; (3) the power of the joint employer to determine the pay rates or the methods of payment of the workers; (4) the right of the employer, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; (5) whether the entity was involved in the preparation of payroll and the payment of wages; (6) ownership of the facilities where work occurred, (7) whether the employee performed a specialty job integral to the business for the alleged employer, and (8) investment in equipment and facilities. *Layton v. DHL Exp. (USA), Inc.*, 686 F.3d 1172, 1176 (11th Cir.2012) (applying the *Aimable* factors to FLSA claims).

No single factor is determinative. *Id.*; *Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir.1996). The weight of each factor depends on the facts of the case. *Id.* at 932–33 (citing *Aimable v. Long and Scott Farms*, 20 F.3d 434, 440 (11th Cir.1994)).

"In entertaining and assessing the evidence with respect to a factor, the court is, in effect, conducting a miniature bench trial." *Martinez–Mendoza v. Champion Int'l Corp.*, 340 F.3d 1200, 1209 n. 27 (11th Cir.2003).

A business that utilizes staffing agencies may be deemed a joint employer of the staffing agency's employees. *See Butler v. Drive Automotive Industries of America*, 793 F.3d 404, 410 (4th Cir.2015) ("the joint employment doctrine also recognizes the reality of changes in modern employment, in which increasing numbers of workers are employed by temporary staffing companies that exercise little control over their day to day activities") (applying the joint employer doctrine in a Title VII case). The Department of Labor has recognized this fact in Administrator's Interpretation No. 2016-1,[13] a recent circular that advises that the economic realities test should be used to determine if a staffing agency and another employer are joint employers.

Plaintiff's allegations, and the affidavits submitted by *both* Plaintiff and Fannie Mae, all plausibly suggest that Plaintiff may be able to prove that Fannie Mae was a joint employer. The Court does not address all of the *Aimable* factors, since it is not actually making a determination as to whether Fannie Mae is a joint employer. Instead, it address factors 1, 2, 3, 4, and 6 to demonstrate that Plaintiff has plausibly

---

**12.** The purpose of the joint employer rule is to expand liability under the FLSA to all employers responsible for compliance with the Act and prevent employer evasion of overtime obligations. 29 C.F.R. § 791.2(a) at n. 5 ("where two or more employers stand in the position of "joint employers" and permit or require the employee to work more than the number of hours specified in section 7(a), both the letter and the spirit of the statute require payment of overtime."); *Donovan v. Sabine Irrigation Co., Inc.*, 695 F.2d 190 (5th Cir. 1983) *cert. denied* 463 U.S. 1207, 103 S.Ct.

3537, 77 L.Ed.2d 1387 (1983); *Preston v. Settle Down Enterprises, Inc.*, 90 F.Supp.2d 1267 (N.D.Ga.2000). *See also* Department of Labor, Interpretive Bulletin No. 13 (1940).

**13.** UNITED STATES DEPARTMENT OF LABOR, ADMINISTRATOR'S INTERPRETATION No. 2016-1, JOINT EMPLOYMENT UNDER THE FAIR LABOR STANDARDS ACT AND MIGRANT AND SEASONAL AGRICULTURAL WORKER PROTECTION ACT (*available at* http://www.dol. gov/whd/flsa/Joint_Employment_AI.htm) (last accessed March 28, 2016).

alleged its joint employer theory and supported it with enough evidence at the conditional certification stage.

First, Fannie Mae allegedly exercised a fair degree of direct and close control over the workers. Fannie Mae set the production goals, (Olas Decl. ¶ 17), and Fannie Mae employees directly managed the underwriters. (Jackson Decl. ¶ 16 ("My supervisor, Fannie Mae credit underwriting manager Jackie Stoddard echoed the directives to not report overtime to me"; Kirk Decl. ¶¶ 15-17.) Fannie Mae employees were also "responsible for administering Fannie Mae's efforts to have experienced underwriters review loans it purchased from lenders including in Fannie Mae's Atlanta, Georgia office." (Kirk decl. ¶ 2.) And Fannie Mae required contractors to sign an agreement that they would adhere to "Fannie Mae's Service Requirements for Contractors and Consultants." (Doc. 39-3 at 19.) Plaintiffs have sufficiently alleged that Fannie Mae exercised at least some amount of control over the staffing agency employees.

Second, Fannie Mae allegedly directly supervised the credit underwriters' work. Individual Fannie Mae managers allegedly directly oversaw the employees' work, and Fannie Mae set the criteria by which its underwriters evaluated the loans they were reviewing. (Kirk Decl. ¶¶ 6-7.) Fannie Mae also set performance metrics for accuracy, (Kirk Decl. ¶ 12), and its "Quality Control Team" went back and reviewed the underwriter's work to make sure it was "accurate." (Id. ¶ 13.) And the employees were directly located in Fannie Mae's office. This all suggests a relatively high degree of supervision.

Third, the evidence submitted thus far supports Plaintiff's allegations that Fannie Mae had the power to influence payment of its staffing agency workers, at least with respect to their overtime pay. Fannie Mae "did not regularly authorize underwriter contractors to work more than forty hours a week." (Kirk Decl. ¶ 23.) Instead, Fannie Mae determined whether or not to "authorize[ ] its vendors to bill for overtime . . . based on Fannie Mae's changing business needs." (Kirk Decl. ¶ 22.) If a contractor was authorized to work overtime but had trouble meeting production goals, then Fannie Mae contacted the contractor and informed them they should not work more than eight hours a day until told otherwise. (Harger Decl. ¶ 17.) Fannie Mae also reviewed the timekeeping of the contractors. (St. Clair Decl. ¶ 6.) And Fannie Mae required individual contractors to obtain pre-approval from a Fannie Mae manager before working overtime. (St. Clair Decl. ¶ 15.) A Fannie Mae supervisor was responsible for talking with a contractor when the contractor reported unapproved overtime. (St. Clair Decl. ¶ 17.) And Fannie Mae received timekeeping records from all contractors. (Id. ¶ 18.) Finally, Fannie Mae allegedly retroactively paid its own credit underwriter employees, for unpaid overtime after an arbitrator determined that they did not qualify as exempt. (Kirk Decl. ¶¶ 28, 30.) This all suggests that Fannie Mae had significant control over overtime reporting procedures and the payment of credit underwriters.

Fourth, Fannie Mae's own affidavits suggest it had the ability to indirectly hire and fire individuals who worked for a staffing agency. Fannie Mae communicated to its Contractor Resource Center if an individual was not meeting quality or production metrics. (Kirk Decl. ¶ 14.) Similarly, Fannie Mae contacted contractors directly, and then contacted its Resource Center, in the event the contractor was working unauthorized overtime. (Harger Decl. ¶ 16.) These facts suggest that Fannie Mae's views carried significant weight if it was dissatisfied with a contractor.

With respect to the sixth factor—ownership of the facilities where the employees worked—this too suggests that Fannie Mae was a joint employer. Though some of the credit underwriters worked at home, those that did not worked at Fannie Mae's Atlanta office. (Jackson Aff. ¶ 4.)

All told, Plaintiff has alleged that she and her staffing agency co-workers (1) worked the same job; (2) subject to the uniform performance criteria set by Fannie Mae; (3) under the supervision of Fannie Mae managers; (4) at Fannie Mae's office; and (5) that Fannie Mae had significant influence on their continued employment and their pay. This is sufficient to plausibly suggest that Fannie Mae jointly employed these individuals along with the staffing agencies.

### 2. Common Policy or Plan

Fannie Mae also argues that Plaintiff has failed to establish that the prospective class members were subject to a common plan or policy that violated the FLSA, because Plaintiff's declarations identify only one "rogue" manager who failed to communicate Fannie Mae's "otherwise lawful [written] policy." (Fannie Mae's Resp. at 14.) According to Fannie Mae, this means that the FLSA violations allegedly suffered by the prospective class members were an aberration—not a company practice.

Courts regularly decline to reach the issue of whether an allegedly unlawful employment policy was "the exception or the rule" at the conditional certification stage. For example, in *Earle v. Convergent Outsourcing, Inc.*, the defendant to a FLSA collective action argued that only "a few rogue supervisors miscommunicated the proper methods for recording hours worked." No. 2:12–CV–1050–WKW, 2013 WL 6252422, at *4–5 (M.D.Ala. Sept. 5, 2013). The court rejected this argument and certified the class, noting that defendants asked for "[too stringent] a showing for the first tier" of certification. *Id.* at *5 (certifying collective action where employees shared a job title and "general job functions and duties"); *see also Longcrier v. HL–A Co.*, 595 F.Supp.2d 1218, 1239 (S.D.Ala.2008) (certifying collective action despite defendant's contentions that nonpayment of overtime was "isolated and sporadic"); *Russell v. Illinois Bell Tel. Co.*, 575 F.Supp.2d 930, 935 (N.D.Ill.2008) (characterizing the argument that a company had a "written overtime policy" that controlled over supposedly isolated policy violations as a "premature" defense "on the merits.")[14]

Here, Plaintiff identified instructions from one named manager that putative class members were not to report overtime, and communications from another

---

14. This Court addressed more diffuse facts in *Jewell v. Aaron's, Inc.*, No. 1:12–CV–0563–AT, 2012 WL 2477039, at *5 (N.D.Ga. June 28, 2012), and still certified a large, nationwide FLSA collective action (though it was later de-certified). There, the plaintiffs held a variety of different positions in a number of different states, but all were allegedly subject to a "work-through-lunch" policy that resulted in their losing overtime pay. The defendant argued employees were only forced to work through lunch without overtime in "isolated incidents" as a result of misconduct by "rogue managers." Defendants also argued that plaintiffs had "fail[ed] to identify the managers who allegedly perpetrated" the bad policy, and in any event, these managers were violating formal written policies. *Id.* at *7.

The Court rejected defendant's position that certification was inappropriate under these circumstances, or that plaintiffs had to identify the specific managers that perpetrated the policy. Instead, like the cases above, this Court found that these sorts of contentions go to "the merits of the underlying claims," rendering them inappropriate for consideration at the first stage of the certification process. *Id.* at *5. And the Court noted that the "existence of a formal policy ... should not immunize the defendant where the plaintiffs have presented evidence that this policy was commonly violated in practice." *Id.* at *7.

named manager who allegedly encouraged credit underwriters to work on the weekend despite the fact that they were already working more than 40 hours per week. (Stewart Decl. ¶ 13 (identifying Jackie Stoddard); Hawkins Decl. ¶ 14 (identifying Donald White)). Additionally, Plaintiff's declarations support the inference that the class members received similar instructions from other Fannie Mae managers. (*See, e.g.*, Tolbert Decl., Doc. 31-5 ¶ 10 ("Because we were not permitted to report overtime hours ... it was a near universal practice of credit underwriters to work overtime hours off the clock to meet our production requirements.").) The declarants aver that it was "common knowledge" that employees worked overtime without pay. (*See, e.g.*, Stewart Decl. ¶ 11.) This is sufficient to overcome Fannie Mae's argument that their written policies controlled over the allegedly "rogue" actions of one or two individuals.

Other facts also suggest (though the Court, of course, does not decide) that the putative class members were subject to a common policy or plan. All potential collective action class members worked the same job, in the same office, doing the same tasks, for the ultimate benefit of the same company (Fannie Mae). And the Complaint appears limited to a relatively small group of individuals. Unlike in some other cases, Plaintiff does not seek to certify a collective action that covers multiple offices or states, or employees with different job titles and duties. Finally, Fannie Mae allegedly retroactively paid unpaid overtime to its W-2 credit underwriters who worked side by side with the putative class members. This further plausibly suggests that credit underwriters as a whole were subject to an unlawful overtime policy.

Finally, Fannie Mae's cases on this point are not convincing. The decisions it cites are either (a) out-of-district and rely on a more stringent certification standard; (b) the exception to the practice in this district, *compare Beecher v. Steak N Shake Operations, Inc.*, 904 F.Supp.2d 1289, 1298 (N.D.Ga.2012) (Evans, J.) (cited at Fannie Mae's Resp. at 19 n. 4) *with* the cases cited *supra* at note 9; or (c) actually support Plaintiff's position. *See Zulauf v. Amerisave Mortg. Corp.*, No. 11–cv–1784–WSD, 2011 WL 12677018 at *19 (N.D.Ga. Nov. 23, 2011) (certifying class after noting that "there is no indication to which managers these [employees] reported" and that none of the declarants identify "which undisclosed member of 'management' encouraged them to work 'long hours' or to work more than 40 hours a week.") None of these cases compel this Court to reach the merits issue of whether there *actually was* a common wage policy or plan, when Plaintiff has submitted enough in the way of evidence to warrant conditional certification.

### 3. *De Facto* Policy Requiring Off-the-Clock Work

█ Fannie Mae next argues that Plaintiff has failed to support her claim that Fannie Mae had a *de facto* policy of off-the-clock work because the company allegedly imposed unrealistic production goals. (Fannie Mae's Resp. at 17.) And, Fannie Mae argues, even if it did have unrealistic production goals, that does not mean that the putative class members all responded by working unreported overtime. (*Id.*) ("Plaintiff makes the herculean leap of logic to assume that, if Fannie Mae's production goals were unrealistic, each member of her putative collective necessarily responded to them by choosing to work more than 40 hours a week as a result, and not report those hours to the Vendor that employed him or her," and that Plaintiff "has not provided any basis for any of these assumptions.")

Fannie Mae again seeks significantly more detail from Plaintiff's declarations than is required for conditional certification. First, Plaintiff actually submitted several declarations from fellow employees that plainly support her allegations. These employees all allege that high production goals directly resulted in their need to work off-the-clock overtime, and Fannie Mae knew this fact. (Pl.'s Br. at 7.) While these declarations may not be intricately detailed, they do not need to be at this preliminary litigation stage.

Fannie Mae's argument that the existence of an unrealistic production quota does not support the inference that employees worked overtime is also misplaced. What Fannie Mae appears to be saying is that *even if* it had unrealistic production goals that required more than 40 hours of work per week, it is more reasonable to assume that some employees would choose *not* to work more than 40 hours—and presumably fail to meet their production goals—than it is to assume that the bulk of them would work more than 40 hours to satisfy their job's requirements. In other words, Fannie Mae suggests that some of its employees were more likely to deliberately miss their production goals than work overtime. Perhaps this is true, but again this is an issue better dealt with after discovery.[15] At the certification stage, Plaintiff's declarations show that (1) employees faced unrealistic production goals that required more than 40 hours of work a week and (2) the employees frequently responded by working more than 40 hours a week, often without overtime. (*E.g.*, Hawkins Decl. ¶¶ 7-11.) Other courts have certified FLSA classes under similar facts. *Zulauf*, 2011 WL 12677018 at *21–22 (certifying a class based in part on a "high production goal" theory and collecting cases doing the same).

And Fannie Mae's cases on this point are again distinguishable. For example, *Horne v. United Servs. Auto. Ass'n*, 279 F.Supp.2d 1231, 1235 (M.D.Ala.2003) involved a lone plaintiff who failed to provide any other declarations at all in support of his motion to certify. That was the primary reason certification was denied in that case—not because he alleged that he was subject to an unreasonable production goal. *Id.* at 1236 ("no ... evidence" was before the court of other employees who were subject to the same policy). *Velasquez v. HSBC Fin. Corp.* involved a putative class of 10,000 members supported by less than a dozen affidavits and deposition transcripts, most of which contained conflicting or weak testimony. More, the defendant in that case submitted *83* declarations opposing certification from other employees who held the same positions as the class members. 266 F.R.D. 424, 429–431 (N.D.Cal.2010). These cases are simply not similar to the one before the Court.[16] Finally, Fannie Mae attempts to distinguish *Falcon v. Starbucks Corp.*, 580 F.Supp.2d 528 (S.D.Tex.2008), which permitted a FLSA class to proceed on the basis that the plaintiff there had "strong

---

**15.** To the extent that Fannie Mae is suggesting that some class members may not have suffered damages, that fact is immaterial at this early stage, as observed in dicta in *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. ——, 136 S.Ct. 1036, 1048–50, 194 L.Ed.2d 124 (2016) (declining to address the precise issue but noting that the employer-petitioners conceded that "[t]he fact that federal courts lack authority to compensate persons who cannot prove injury does not mean that a class action (or collective action) can never be certified in the absence of proof that all class members were injured.")

**16.** Fannie Mae also argues that the evidence is contrary to Plaintiff's own work habits, and that several plaintiffs reported less than 80 hours per each two week pay period a substantial amount of the time. (Fannie Mae's Resp. at 18.) This too is a merits argument, unsuitable for the class certification stage.

evidence" of a *de facto* policy. But Fannie Mae misses the procedural posture of that case: that decision was rendered on a motion to decertify, *after* the plaintiff had the opportunity to conduct discovery.

#### 4. Different Vendors

Fannie Mae finally argues that Plaintiff has not met her burden in showing the putative class was subject to the exact same time reporting and pay practices, because the potential class members worked for eight different vendors.

First, Fannie Mae offers no case support for its argument that this fact should absolutely bar certification. Second, a putative collective action class must be the subject of *a* common policy or practice of an employer, not *every* policy and practice. Other courts have conditionally certified classes containing employees with allegedly different roles, or who worked for allegedly different subcontractors or vendors. *Lima v. Int'l Catastrophe Sols., Inc.*, 493 F.Supp.2d 793, 799–800 (E.D.La.2007) (conditionally certifying collective action when class members worked for different subcontractors, and noting, "[i]f sufficient evidence is not developed to demonstrate that the other subcontractors were not involved in the same alleged scheme or practice, the Court may decertify the collective action as to those parties after sufficient discovery is conducted"); *Glass v. City of Atlanta, Ga.*, No. 1:13–CV–1822–RWS, 2014 WL 9954054, at *3 (N.D.Ga. May 6, 2014) (certifying class of seasonal park employees even though defendant argued that "each district supervisor [of the class members] is responsible for his own timekeeping"); *Scott v. Heartland Home Fin., Inc.*, No. CIV.A. 1:05–CV–2812–TWT, 2006 WL 1209813, at *3 (N.D.Ga. May 3, 2006) ("variations in specific duties, job locations, working hours, or the availability of various defenses are examples of factual issues that are not considered at this stage") (allegations that plaintiffs all worked more than 45 hours during a one-week period and were not paid minimum wage were sufficient to certify class). Fannie Mae offers no compelling reason to depart from the logic of these cases.

 Here, Plaintiff submitted declarations stating that credit underwriters who worked at the same Fannie Mae office, doing the same Fannie Mae job, subject to the same demanding Fannie Mae production quotas, all regularly worked more than forty hours a week but were prevented from reporting overtime. That is sufficient at this early stage, even if these employees were technically employed by different vendors—especially in light of clearly colorable evidence that Fannie Mae was a joint employer of credit underwriters alongside these vendors. While Fannie Mae offers evidence that purports to establish that each vendor was "solely responsible, at its own cost" for the calculation of overtime and wages (Fannie Mae's Resp. at 6), this does not obviate the fact that Plaintiff has provided support for its allegations that Fannie Mae, alongside the eight staffing agencies (also referred to herein as "staffing vendors" or "vendors"), imposed a uniform policy requiring "off-the-clock" work. (*See* Section B.1, *supra*, discussing the nature of Fannie Mae's alleged joint control.) If Plaintiff's allegations are true, then the vendors' "calculation and payment of wages" entailed little more than filling in the answer to a math equation that Fannie Mae wrote and provided all of the relevant variables for. And if individual differences in how the vendors handled certain wage matters wind up being material to the core policy at issue in this case, then Fannie Mae can move for decertification.

#### C. Defendant Open Systems' Objections to Conditional Certification

Defendant Open Systems opposes Plaintiff's Motion for Conditional Certification,

both in its Response and in its Motion to Dismiss Opt-in Plaintiffs and Strike Collective Action Allegations, by asserting that Jackson and the putative class members are not similarly situated. To support this assertion, Open Systems primarily relies on the fact that Jackson and the opt-in plaintiffs were employed by different W-2 employers.

### 1. Similar Job Positions and Duties

Open Systems first argues that plaintiffs employed by separate W-2 employers are precluded from establishing that they held similar positions or performed similar duties.[17] However, Open Systems provides no support for this sweeping claim other than to state that it is not aware of any case where the court conditionally certified a collective action under those circumstances.

Open Systems' argument misses the mark. This case deals not with similarly titled employees working exclusively for individual employers, but instead, with employees who—despite receiving paychecks from various staffing agencies—all performed the same work ultimately on behalf of the same company, Fannie Mae. Although precedent directly answering whether plaintiffs employed by different W-2 employers can have similar positions or duties is limited, Open Systems discounts the fact that the standard for certification at the notice stage is lenient. Plaintiffs need not show that they held *identical* positions. *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir.2001); *Grayson v. K-Mart Corp.*, 79 F.3d 1086, 1096 (11th Cir.1996). Rather, Plaintiff need only show that she and the putative class members held *similar* positions. *Hipp*, 252 F.3d at 1217; *Grayson*, 79 F.3d at 1096. Here, Plaintiff easily satisfies this burden.

Even if the putative class members in this case may have been employed by different staffing agencies, all were placed in Fannie Mae's Atlanta office to work as credit underwriters. All the putative class members worked in the same location, held the same job title, performed the same work, and were subject to the same production requirements. And once again, Plaintiffs provided colorable evidence that Fannie Mae and its vendors were joint employers with respect to credit underwriters at Fannie Mae's Atlanta, Georgia office.

### 2. Common Policy or Plan

Open Systems next argues that Plaintiff failed to demonstrate that the putative class members were subject to the same unified policy, plan, or scheme in violation of the FLSA. Open Systems asserts that Plaintiff failed to make any allegations about the time reporting or wage paying practices of Open Systems or any other staffing agency. Instead, Plaintiff identified only Fannie Mae's allegedly unlawful overtime reporting policy. According to Open Systems, this identification is not enough for Plaintiff to satisfy her burden, even at the notice stage.

Like Fannie Mae however, Open Systems provides no case support for this argument and incorrectly assumes that, because the putative class members were allegedly subject to the wage and hour practices of their individual W-2 employers, they could not have been subject to any unified wage policy, thus preventing certification. This misapplies the law. A putative class satisfies the similarly situated standard at the notice stage when the plaintiffs make "substantial allegations that the putative class members were together, the victims of a *single* decision,

---

17. Open Systems posits that "[i]mplicit in the standard that the putative class members have similar job positions and duties is the fact that they are, or were, employed by the same employer who has common control over their terms and conditions of employment." Open Systems' Resp. at 8.

policy, or plan." *Scott*, 2006 WL 1209813, at *2.

Here, Plaintiff has submitted several declarations, all asserting that Fannie Mae forced credit underwriters to comply with production quotas that required more than forty hours per week to complete and prohibited underwriters from reporting overtime until they had met those quotas. This sufficiently identifies a single common policy affecting all putative class members, irrespective of differences among the vendors. In addition, even if time reporting and wage payment practices varied among the different staffing vendors, individualized inquiries into how Fannie Mae's policy impacted each class member go to the merits of Plaintiff's claims and can be raised during the decertification stage. *Id.* at *3 ("variations in specific duties, job locations, working hours, or the availability of various defenses are examples of factual issues that are not considered at this stage").

### 3. Open Systems' Relationship to Opt-in Plaintiffs

Finally, Open Systems broadly asserts that Plaintiff cannot proceed as a class because "there are no circumstances under which Open Systems can be liable under the FLSA to the opt-in plaintiffs." (Open System's Mem. at 7.) It further contends that certification will result in prejudice to Open Systems because it will then be forced to defend against parties to whom it cannot be liable. Once again, Open Systems cites to no cases supporting its flawed conclusions.

■ The fact that the putative class contains members to whom a named defendant may not be liable does not automatically preclude certification. *Kuperman v. ICF Int'l*, No. 08–565, 2008 WL 4809167, at *6 (E.D.La. Nov. 3, 2008) (certifying a class of "Housing Analysts" and "Advisors" who alleged a "broad policy of intentionally instructing employees not to clock overtime hours," despite the fact that some of the plaintiffs worked for only one or the other of three named defendants); *Bernal v. Vankar Enters.*, No. SA–07–CA–695–XR, 2008 WL 791963, at *4 (W.D.Tex. Mar. 24, 2008) (granting conditional certification against three separate bars where the named plaintiff alleged a common tip sharing policy that violated the FLSA, noting the lenient standard at the notice stage and reasoning that the defendants could be joined under Rule 20 of the Federal Rules of Civil Procedure); *Lima*, 493 F.Supp.2d at 800 (certifying a collective action against a general and subcontractor that included members who worked for subcontractors other than the named defendant because the court found it reasonable to conclude that the general contractor may have engaged in similar payment practices with other subcontractors).

In addition, to the extent that litigating this action collectively may result in prejudice to Open Systems, such concerns are more appropriately raised at the decertification stage. *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir.2007) (noting that considerations at the decertification stage include: "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations" (citing *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001)). Here, Plaintiff has made allegations sufficient to demonstrate that she and the putative class members are similarly situated and that other credit underwriters wish to join this putative class action. The Court need not address objections to conditional certification based on concerns other than these any further.

### D. Summary of the Reasons for Conditional Certification

For the reasons described above, the Court is conditionally certifying Plaintiff's

collective action. Plaintiff has alleged and provided evidence suggesting that she and a number of other staffing agency credit underwriters were subject to a uniform, unwritten policy requiring uncompensated overtime while they worked at Fannie Mae's Atlanta, Georgia office.

Plaintiff's theory of conditional certification is supported by evidence and applicable case law. That evidence suggests, at this early stage, the putative class members all worked the same job, doing the same work, with the same duties, at the same office, under the same Fannie Mae supervision, and subject to the same loan review production quotas that allegedly required more than 40 hours of work per week. Second, Fannie Mae's own evidence tends to suggest that it may have had a significant role in the supervision of the staffing agency employees. This supports Plaintiff's theory that Fannie Mae jointly employed the prospective class members.

Third, the class is relatively small at less than 100 individuals, and is geographically concentrated (a single office in a single city). These facts remediate some of the concerns about the unwieldiness of a prospective class—especially a class with employees who had different duties or titles—that are sometimes present at the conditional certification stage.

Finally, Fannie Mae already paid allegedly unpaid overtime to its W-2 credit underwriters after an arbitrator determined those individuals were no longer exempt. These individuals worked the same job at the same office as the prospective class members. This too indicates that Fannie Mae's policies both (1) required employees to work overtime, at least on occasion, and (2) required them to not report it.

Given the above facts, conditional collective action certification is appropriate.

## III. Plaintiff's Motion to Toll Statute of Limitations

Plaintiff seeks to toll the statute of limitations for "individuals that have filed or file their consent to join this action ... for a period of 60 days beyond any Order denying the Motion for Conditional Collective Action Certification." Because the Court is granting the Motion for Conditional Collective Action Certification, the Court **DENIES WITHOUT PREJUDICE** Plaintiff's Motion to toll the statute of limitations [Doc. 57].

## IV. Class Notice

Finally, Fannie Mae challenges the sufficiency of the proposed class notification. The Court agrees that Plaintiff's notice is deficient in a number of respects. Specifically, the Court agrees that the notice should:

1. Briefly state Defendants' position on the suit in a non-argumentative fashion, i.e., simply that Defendants deny Plaintiff's allegations in full;

2. Advise the potential opt-in Plaintiffs that they may be required to participate in discovery;

3. Should be directed towards contractors who worked unpaid overtime during the relevant time period at the relevant office, instead of contractors who were specifically "required" to work unpaid overtime by Fannie Mae (*See* Doc. 39 at 24);

4. Provide an opt-in deadline of 45 days from the date of the notice on the opt-in form;

5. Make clear that the Plaintiffs are not obligated to consent to join any "subsequent action or arbitration" in the event that the case does not proceed collectively (i.e., if it is decertified).[18]

18. Plaintiffs can obtain social security numbers at a later date.

6. The opt-in form should include a space where potential plaintiffs can indicate which staffing vendor or contractor(s) they worked with.

The above list is of course not exhaustive, and the Parties should include all other necessary and relevant information and requests for information in the proposed consent opt-in notice and opt-in form.

The Parties are **DIRECTED** to submit a modified consent opt-in notice and form within seven (7) days of this Order. If the Parties cannot agree on a consent form, they should submit their respective proposed versions.

In addition, Fannie Mae is **DIRECTED** to provide to Plaintiff's counsel contact information for the remaining seven (7) staffing vendors (including contact information for their counsel, if available), so that Plaintiff's counsel may attempt to expeditiously serve any such vendors it seeks to add to the case by amendment.

Plaintiff is **DIRECTED** to file a motion to amend her Complaint to add any necessary staffing vendors within five (5) days [19] after the 45-day opt-in notice period expires.

Plaintiff is further **DIRECTED** to take all steps necessary to attempt to serve the amended complaint within ten (10)[20] days of its filing upon any staffing vendors added by the amendment. Plaintiff is **DIRECTED** to attempt to provide direct service under Fed. R. Civ. P. 4(h), and avoid seeking waiver of service pursuant to Fed. R. Civ. P. 4(d) if at all feasible, so as to facilitate the timely handling of the first stage of these proceedings.

## V. CONCLUSION

For the foregoing reasons, Plaintiff's Motion [Doc. 31] is **GRANTED AS PROVIDED HEREIN.** Plaintiff's Motion to Toll Statute of Limitations [Doc. 54] is **DENIED WITHOUT PREJUDICE AS UNNECESSARY AT THIS TIME.** Open Systems' Motion [Doc. 38] is **DENIED.**

**IT IS SO ORDERED** this 29th day of March, 2016.

---

19. In the event that this date falls on a weekend or holiday, Plaintiff should file her amended complaint by the next business day.

20. In the event that this date falls on a weekend or holiday, Plaintiff should make all efforts to serve her amended complaint by the next business day.